THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| JOSEPH ALBERT TAYLOR, | ) | 4:03CV3124 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | **FINDINGS OF FACT** |
| RAYMOND EDELMAN, | ) | **AND CONCLUSIONS** |
| Caseworker; CORPORAL | ) | **OF LAW** |
| CIFARELLI; JOHN DOE(S), | ) | |
| Unidentified Officers; SERGEANT | ) | |
| SULLEY; RANDY CROSBY, | ) | |
| Case Manager; ROBERT MADSEN, | ) | |
| Unit Manager; JANE DOE, | ) | |
| Unidentified Nurse; FRANK X. | ) | |
| HOPKINS, N.S.P. Warden; JOHN | ) | |
| DOE, Unidentified Deputy Director, | ) | |
| HAROLD W. CLARKE, N.D.C.S. | ) | |
| Director, | ) | |
| | ) | |
| Defendants. | ) | |

    Plaintiff Joseph Taylor, a prisoner in the custody of the Nebraska Department of Corrections, brings this action pursuant to 42 U.S.C. § 1983 alleging that the defendants violated his Eighth Amendment rights by using an excessive amount of force to remove him from his cell and transport him to a holding area while a night light in his cell was being replaced on April 26, 1999, in the Control Unit of the Nebraska State Penitentiary. After a three-day nonjury trial, I now issue my findings of fact and conclusions of law pursuant to Fed. R. Civ. P. 52(a).[1]

---

[1] Any finding of fact more properly characterized as a conclusion of law, and any conclusion of law more properly deemed a finding of fact, should be so construed.

## FINDINGS OF FACT

1.      On April 26, 1999, plaintiff Joseph Taylor was an inmate at the Nebraska State Penitentiary ("NSP") and was assigned to the Control Unit[2] within that institution. Prior to that time, Taylor had been confined at the Lincoln Correctional Center ("LCC"), where he was convicted of committing an aggravated assault on an LCC employee. On May 1, 1998, Taylor was transferred from LCC to NSP. (Filing 79, Order on Final Pretrial Conf., at 2-3.)

2.      On the date at issue in this case, most of the defendants were employed at the NSP: defendant Raymond Edelman was a caseworker who worked in the NSP Control Unit; defendant Sulley was a sergeant; defendant Randy Crosby was a case manager; defendant Robert Madsen was a unit manager; and defendant Frank Hopkins was the warden. Defendant Harold Clarke was the Director of the Nebraska Department of Correctional Services ("NDCS"). (Filing 79, at 3.)

3.      Taylor also named as defendants "John Doe(s) (Unidentified Officers)," "John Doe (Unidentified Deputy Director)," and "Jane Doe (Unidentified Nurse)." The parties' Order on Final Pretrial Conference (filing 79) states that Taylor has identified the "John Does" as Ervin Fessler, an NSP sergeant, and K. Shortridge, the NSP Deputy Director at that time. The order also identifies "Jane Doe" as J.D. Hassenfelt, an NSP nurse. (Filing 79, at 4 & 7.)[3]

---

[2] The NSP "Control Unit" houses inmates who are being segregated from the general prison population because they are a threat to themselves or others.

[3] Taylor also named as a defendant Corporal Cifarelli, who the parties agree was served with process at NSP in 2003, but has not responded. The special assistant attorney general claimed that she did not represent Cifarelli, as he is no longer employed by the NDCS. Taylor moved for default judgment against Cifarelli at the end of trial. Because Taylor did not move for default judgment against Cifarelli until the end of trial, neither party endorsed him as a witness, and

4.      While in the NSP Control Unit, Taylor felt like defendant Edelman was "stalking" him in a sexually suggestive way. Edelman's actions left Taylor with the impression that Edelman was homosexual.[4]

5.      On April 26, 1999, defendants Edelman and Cifarelli and an NSP maintenance employee went to Taylor's cell in the Control Unit of the NSP for the purpose of removing Taylor from his cell and transporting him to a holding area while a night light in his cell was replaced.  Edelman ordered Taylor to put his hands through the approximately 11" x 4 ½" slot on the front of his closed cell door so the men could handcuff Taylor. Taylor complied, and Edelman cuffed Taylor's left wrist. Taylor then pulled both of his hands back into the cell and told Edelman he did not want a "queer" to touch him. Taylor repeatedly refused Edelman's orders to put his hands back through the slot so his right wrist could be cuffed. At that time, Edelman called for assistance, and Sergeant Sulley came down the gallery.[5] Sulley recalled that when he reached the scene, Taylor had refused to cooperate, Taylor was in a position to use the dangling handcuff as a weapon against a person or on the cell door, and Edelman could have lost his grip on the come-along chain. Sulley told Corporal Tomek to inform Unit Manager Madsen of the problem with Taylor.

6.      In an attempt to get Taylor's hands back through the slot, Edelman yanked on the metal rings that were attached to a 4- to 5-foot "come-along" chain that was

---

someone other than Cifarelli signed for service of process, Taylor's motion for default judgment was denied. However, I ruled that Taylor's testimony regarding Cifarelli's actions would be deemed true because both parties agreed that he was involved in the incident at issue.

[4]Edelman testified that he has been married for 34 years and is not homosexual.

[5]"Gallery" is apparently the term commonly used to refer to the hallway outside the cells.

3

linked to the handcuffs. Edelman is not sure whether Taylor's hand or hands became jammed in the slot when he pulled on the metal rings. Edelman was not aware of any injury to Taylor at that time.

7. After Taylor's hands came back through the slot in the door and Taylor's other hand was cuffed, the cell door slid halfway open; Cifarelli placed leg shackles on Taylor; Edelman pushed the come-along chain through the slot to the inside of the cell to allow Cifarelli to escort Taylor from the cell; the door slid completely open; and Cifarelli removed Taylor from his cell into the gallery near the wall that was 7 ½ to 8 ½ feet across from the cell. Throughout this process, Taylor continued making comments about Edelman's sexual orientation and threatening Edelman. Taylor testified that he was angry at Edelman and was yelling at him. (Exs. 7 & 21.)

8. Once in the gallery, Taylor made a move toward Edelman, stated that he intended to hurt Edelman, and attempted to kick him. Taylor admits that he was being "verbally abusive" during the incident. Edelman felt threatened by Taylor's actions, but Taylor did not actually touch Edelman. In the past, Edelman has been kicked by inmates wearing leg shackles and has seen an inmate in handcuffs and leg shackles throw a prison guard against a wall.

9. Defendant Madsen, the Control Unit manager, ordered Edelman and Cifarelli to "take him down." Cifarelli yanked the come-along chain to get Taylor away from Edelman, causing Taylor to land face-down on the floor with his hands in front of him. Because Cifarelli was positioned close to the wall, Taylor's head hit the wall as he was falling to the ground. Sulley testified that he has been trained to pull on the come-along chain to get a prisoner off balance if needed.

10. Madsen then removed the come-along restraint and secured Taylor's arms behind his back with handcuffs. Once Taylor had been "taken down," Edelman held Taylor's left shoulder and head to the floor; Sulley held Taylor's legs; and Case

Manager Crosby, who was later relieved by Sergeant Fessler, secured Taylor's right shoulder and arm. (Exs. 7 & 21.)[6]

11.  Madsen then left the gallery, radioed for additional staff, and noted that Corporal Rotschafer had gotten the Control Unit video camera at Sergeant Sulley's request. Madsen then returned to the scene and instructed the men holding Taylor down to transport him to the "Bull Pen," or holding area. NSP employees did not videotape the first part of the incident because no one anticipated having to use force to remove Taylor from his cell for a maintenance matter, making this a "spontaneous" use of force. Once enough help had arrived to control the situation, videotaping was ordered and performed. Former NDCS Director Harold Clarke testified[7] that planned uses of force in NSP segregation units must be videotaped according to "policy and procedure."

12.  NSP registered nurse J.D. Hassenfelt was asked to assess Taylor as he was lying prone on the floor in the Bullpen. When Hassenfelt asked Taylor if he needed medical attention, Taylor replied "not from the State of Nebraska" and commented that the nurse had asked a "redundant" question. The nurse noticed a small abrasion on

---

[6]Taylor testified that someone "slammed" into his back during the take-down, grabbed his hair and "slammed" his head into the floor, pulled on the come-along chain which had somehow slipped around his neck, and jumped on him. Taylor's fellow inmates in the Control Unit testified that Edelman or Cifarelli spun Taylor around, threw him against the wall, banged Taylor's head into the floor four times, and choked him with a chain. I find credible only the portions of this testimony on which most all of the witnesses agree—Taylor's head hit the wall and floor during the take-down.

[7]Although Harold Clarke is no longer employed by the NDCS and lives outside the state of Nebraska, he was ordered to appear at trial because the government failed to file a motion to dismiss Clarke (or any other defendant) from this action. (Filing 83.) The government also did not file a motion for summary judgment or a trial brief.

5

Taylor's right wrist. Taylor was given a Band-aid. (Ex. 18.)

13. After the night light in Taylor's cell was repaired and his cell was searched (approximately 30 minutes from when Edelman and Cifarelli had first approached Taylor's cell), Taylor was returned to his cell. Taylor noticed that the handcuffs had cut into his skin, his elbow was bleeding, his forehead and hands were swollen, and he had bruises. Edelman was not aware Taylor was injured during any part of the incident. While he saw a spot of blood on his own pants in the knee area, he did not see blood on Taylor or on the floor.

14. That same day, a NDCS Disciplinary Misconduct Report was filed against Taylor as a result of this incident. While Taylor was present at the misconduct hearing held the following day, Taylor refused to participate. (Ex. 7.)

15. On May 5, 1999, Taylor filed a grievance regarding the incident. (Ex. 8.) On May 6, 1999, Taylor filed an Inmate Interview Request form telling staff that the reason his grievance had been filed late was because "it took time for this inmate to recuperate physically and mentally in order to comfortably and accurately put to paper the events leading to . . . the incident." (Ex. 9.) There is no evidence that Taylor requested medical treatment for any injuries he may have sustained in the incident. He testified that he did not make repeated requests for medical treatment because inmates are constantly made to feel like "begging dogs." On May 10, 1999, defendant Crosby responded to Taylor's grievance by citing an NDCS Rule and Regulation that required informal grievances to be filed within three days of the incident, and because Taylor's grievance did not meet that time requirement, the grievance was returned without response.

16. Also on May 10, 1999, Taylor filed a Step One Grievance with the Chief Executive Officer of the NSP, Warden Frank Hopkins. Hopkins testified that despite the fact that Taylor's grievance had been untimely filed, Hopkins directed the unit

administrator's office to review the matter. After written staff reports were collected, the unit administrator's office concluded that Taylor's claims were unsubstantiated. On May 13, 1999, Hopkins responded to Taylor's grievance, stating that he supported Crosby's May 10 response, and "Caseworker Edelman denies assaulting you in any way. Your allegations represent your opinion and are unsubstantiated." (Ex. 10.)

17. On May 15, 1999, Taylor appealed Hopkins's decision with a Step Two Grievance. (Ex. 11.) On June 4, 1999, NDCS Deputy Director Karen Shortridge responded to the appeal, stating that "DCS rules require grievances to be filed within three days of the incident of concern. Your grievance has not been timely filed. I also note that as stated in the CEO's response to your Step One Grievance, your allegations are unsubstantiated." Former NDCS Director Harold Clarke testified that because Taylor did not file his grievance on time, Shortridge had no duty to conduct an official investigation of any kind.

18. Case Manager Randy Crosby testified that all employees receive annual training in the use of force. Edelman, Sulley, Madsen, and Crosby testified that they have been trained to use the least amount of force necessary to control the situation. Crosby stated that combative inmates need to be "taken down" for staff safety. Frank Hopkins, now an Assistant Director for NDCS, testified that NDCS employees have been reprimanded, disciplined, and terminated for the excessive use of force.

**CONCLUSIONS OF LAW**

"Excessive-force claims brought by prisoners fall under the protections provided by the Eighth Amendment's prohibition of cruel and unusual punishment." Andrews v. Neer, 253 F.3d 1052, 1061 (8th Cir. 2001). When the alleged constitutional violation is that prison officials have used excessive force, as Taylor claims here, I am to consider "'whether force was applied in a good-faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm.'" Id. (quoting

Whitley v. Albers, 475 U.S. 312, 320-21 (1986)). "Factors relevant to this determination include the threat the officials reasonably perceived, the need for the use of force, the efforts made to minimize the force used, the relationship between the need for using force and the amount of force used, and the degree of injury inflicted." Howard v. Barnett, 21 F.3d 868, 871 (8th Cir. 1994).

"[W]hether the Eighth Amendment was violated turns on whether force was applied . . . maliciously and sadistically to cause harm, not on whether a serious injury resulted from that force." Howard, 21 F.3d at 872-73 (citation and quotation marks omitted). "'[M]aliciously' and 'sadistically' have different meanings, and the two together establish a higher level of intent than would either alone. One acts 'maliciously' by undertaking, without just cause or reason, a course of action intended to injure another; in contrast, one acts 'sadistically' by engaging in extreme or excessive cruelty or by delighting in cruelty. Webster's Third New International Dictionary 1367, 1997-98 (unabridged 1981); Black's Law Dictionary 956, 958, 1336 (6th ed. 1990); The American Heritage Dictionary 759, 1084 (2d ed. 1982)." Howard, 21 F.3d at 872.

There is no credible evidence that the defendants in this case used force upon Taylor without just cause, intending to injure him, and that the defendants engaged in, or delighted in, extreme or excessive cruelty. To the contrary, Taylor repeatedly refused to cooperate with the prison officials' simple and direct requests to cuff up so he could exit his cell and proceed to the holding area while a maintenance employee changed a light bulb in his cell. Taylor was admittedly angry and verbally abusive toward defendant Edelman as Edelman tried to handcuff Taylor's second wrist, creating a situation where Taylor was in a position to use the dangling handcuff as a weapon against a person or on the cell door, and where Edelman could have lost his grip on the come-along chain. Taylor threatened to harm Edelman, who had previously been kicked by inmates wearing leg shackles and has seen an inmate in handcuffs and leg shackles throw a prison guard against a wall.

8

The defendants who witnessed or participated in the incident testified that Taylor made a move toward Edelman in the gallery hall. Upon seeing Taylor's move toward Edelman, and after being advised that there had been a problem getting Taylor out of his cell, Unit Manager Madsen ordered that Taylor be "taken down." Edelman, Cifarelli, and Sulley complied. On Taylor's way "down," Taylor's head hit the gallery wall and floor. Afterward, Taylor was held in place by some of the defendants, who later transported him to the Bull Pen and back to his cell.

These are not actions indicative of an intent to injure Taylor; rather, as they were taught in their annual excessive-force training, the defendants used as much force as was necessary to control and neutralize an admittedly angry and verbally abusive Taylor during an unexpectedly threatening and hostile situation. Under these circumstances, I must conclude that the defendants used an appropriate amount of force against Taylor in a good-faith effort to maintain or restore discipline, not maliciously and sadistically for the very purpose of causing Taylor harm. Thus, I must enter judgment in favor of the defendants on Taylor's Eighth Amendment claim.

IT IS ORDERED:

1. Judgment shall be entered by separate document in favor of the defendants and against the plaintiff, providing that the plaintiff shall take nothing and this case is dismissed with prejudice;

2. To the extent there are still pending any oral motions to dismiss parties that were asserted at trial, they are denied as moot.

February 23, 2006.

BY THE COURT:
s/ *Richard G. Kopf*
United States District Judge